2000 OK 40

**Odilia DANK, Member of the Oklahoma House of Representatives, Petitioner,**

v.

**The Honorable Loyd BENSON, Speaker of the Oklahoma House of Representatives, Respondent.**

No. 94,166.

Supreme Court of Oklahoma.

May 23, 2000.

Gary W. Gardenhire, Norman, OK, for the petitioner.

W.A. Drew Edmondson, Attorney General of Oklahoma; Andrew Tevington, Asst. Atty. Gen.; and Neal Leader, Sr. Asst. Atty. Gen., Oklahoma City, OK, for the respondent.

Lee Slater, Oklahoma City, for amicus.

LAVENDER, J.

¶ 1 Dank [petitioner] asks this Court to decide whether the custom and practice employed in the House of Representatives when proposed legislation is brought up for final vote offends the provisions of Okla. Const. art. 5, § 34.[1] She also asks that, if current legislative procedure is found to be constitutionally deficient, the Court mandate what procedure the House should follow.[2] Before the merits of Dank's petition can be reached, the Court must decide if her claim is "justiciable," i.e., whether it is susceptible of judicial

resolution. We conclude that her claim—presented, as it is, in the context of an *intra-House* dispute—is nonjusticiable.

I

**FACTS AND PROCEDURAL HISTORY**

¶ 2 Petitioner Odilia Dank, a member of the Oklahoma House of Representatives [House] since 1994, today asks the Court to review how the House procedurally conducts itself when pressing for the final passage of a bill. She asserts that the House has "never" caused proposed legislation to be "read at length" before a final vote is taken on it—a process which, according to her, is constitutionally mandated. Dank contends the constitutionally-deficient legislative procedure persists in spite of several efforts on her part to change it. On past occasions petitioner has sought to have the House change its rules to comport with her understanding of the "read at length" requirement and she has raised (with limited success) points of order contesting the leadership's failure to comply with Okla. Const. art. 5, § 34's provisions.[3] Dank has also secured an Oklahoma Attorney General's opinion [4] on the meaning of the pertinent constitutional provision in an attempt to heighten the House's understanding of and compliance with the "read at length" provision.

¶ 3 Petitioner would have the Court (1) construe Okla. Const. art. 5, § 34's phrase *"read at length"* to mean "reading each and every word of the bill proposed to be finally passed from beginning to end, without omis-

---

1. The terms of Okla. Const. art. 5, § 34 provide:

 "Every bill shall be read on three different days in each House, and no bill shall become law *unless, on its final passage, it be read at length,* and no law shall be passed unless upon a vote of a majority of all the members elected to each House in favor of such law; and the question, upon final passage, shall be taken upon its last reading, and the yeas and nays shall be entered upon the journal." [Emphasis added.]

2. The relief which the petitioner seeks in her application is at variance with the position she advanced during oral argument where she indicated that a declaratory judgment would suffice. Nonetheless, she has not amended her paperwork filed in this cause where a writ of mandamus directed to the House is sought.

3. For the terms of Okla. Const. art. 5, § 34 see *supra* note 1.

4. Attorney General's Opinion No. 98–38.

sion and not in summary form"[5] and (2) to condemn the House's *internal custom and practice* currently used to bring measures to a final vote (when these procedures do not require proposed legislation to be "read at length"). *Petitioner's application does not challenge any specific, enrolled legislation as being constitutionally flawed.* Rather the sole focus of her quest is reformation of the legislative process used to inform House members of a bill's content before a final vote is taken on the same. Lastly, petitioner's paperwork does not draw the Court's attention to any specific procedural infractions of a constitutional dimension in the *current* legislative session but rather *predicts* that the same will occur since they have in the past.[6]

¶ 4 Loyd Benson [respondent], the House Speaker, asserts absolute immunity to the petitioner's suit premised upon the protection afforded by the Speech and Debate clause[7] to his conduct while presiding over the House. Since we find that the petitioner's application does not present a justiciable cause and hence decline to assume original jurisdiction over the same, it is not necessary to reach the merits of the respondent's claim of immunity.

## II

### DANK'S APPLICATION PRESENTS A NONJUSTICIABLE CLAIM

#### A

¶ 5 As we begin our analysis today, we are mindful of the Court's holding in *City of*

*Sapulpa v. Land,* 101 Okla. 22, 223 P. 640, 644 (1924), that:

> "The judiciary system of this state is the creature of the Constitution and the statute laws of the state. The Supreme sovereign power of this state rests in the people of the state."

The enunciated legal principle rightly demands great respect for the people's will as expressed in the state's organic law. Though the resolution of causes often turn upon the law's minutiae, there are indeed conflicts—such as the one now before the Court—which find much of their resolution in broader constitutional principles.

 ¶ 6 Because Dank takes issue with the House procedure used to bring proposed legislation to a final vote, her action necessarily implicates the constitutionally-committed authority of each House[8] to adopt its own rules of internal procedure. The requested relief asks the Court to interject itself into the legislative process constitutionally committed to the House of Representatives[9] and render an opinion concerning how this body should conduct its business. While Oklahoma's Constitution gives the Supreme Court appellate jurisdiction to review and assess the lawfulness of legislative enactments and original jurisdiction over prescribed entities,[10] only under the most exi-

---

5. Petitioner offers that while it is the House's custom and practice to furnish Members with a printed form of the bill before the final vote is taken, bills are often lengthy and time constraints prevent her from reading the same at length before she is required to vote. Petitioner's counsel also acknowledged during oral argument that it would be physically impossible for the House to "read at length" [as Dank has defined the phrase] the volume of legislation pending before the House in the current legislative session.

6. Counsel for respondent in oral argument before the Court offered—and the petitioner did not controvert—that the House's journal reflects that during the 1999 legislative session the Members were not asked to vote on proposed legislation solely on the basis of bill summaries and were in fact provided with full copies of all bills before votes were taken upon the same. Respondent did acknowledge that the complained of procedures were used in earlier legislative sessions.

7. *See* Okla. Const. art. 5, § 22.

8. *See* Okla. Const. art. 5, § 30, which provides in pertinent part:

> "Each House may determine the rules of its proceedings...."

9. *See* Okla. Const. art. 5, § 1, whose pertinent terms provide:

> The Legislative authority of the State shall be vested in a Legislature, consisting of a Senate and a House of Representatives...."

10. *See* Okla. Const. art. 7, § 4, whose pertinent terms provide:

> 'The appellate jurisdiction of the Supreme Court shall ... extend to all cases at law and in equity.... The original jurisdiction of the Supreme Court shall extend to a general superintending control over all inferior courts and

gent circumstances are we to intercede in the internal affairs of a coordinate branch of government when it exercises a function—i.e., legislative or executive—committed to it by the Constitution.[11] The framers clearly intended a separation of power [12] between the executive, legislative and judicial branches of government.[13] General constitutional order is offended when one department of government usurps power expressly delegated to another.[14] Hence, it is with heightened consideration that the Court assays Dank's application for the relief (a declaratory judgment and writ of mandamus) which she asks the Court to grant.

### B

■ ¶ 7 Petitioner claims there is a likelihood that the House (through its elected leadership, i.e., the Speaker) will engage in future procedural *conduct* which will be violative of Okla. Const. art. 5, § 34. In essence her claim—which is not based on *actual, reported* procedural acts of the current Legislature and does not assert constitutional flaws in enacted legislation—asks the Court to address a hypothetical situation which may or may not arise. It is not the business of the Court to give advisory opinions on hypothetical questions.[15] [Were it different legislators could pose questions to the Court about *proposed* legislation—a process which today lies without the scope of the Court's jurisdiction.]

■ ¶ 8 To be justiciable Dank's claim must be suitable for judicial inquiry. This requires determining whether the controversy (a) is definite and concrete, (b) concerns legal relations among parties with adverse interests and (c) is real and substantial *so as to be capable of a decision granting or denying specific relief of a conclusive nature.*[16] Petitioner's claim fails to satisfy the enunciated test in two regards.

■ ¶ 9 First, the petitioner's claim fails to satisfy the test's initial criterium, i.e., is the claim fixed and substantive and not of a hypothetical character. For the Court to assume original jurisdiction and to grant the requested form of relief the cause must be of *sufficient immediacy and reality* as to warrant the pronouncement of judgment. The asserted claim implicates neither (a) enrolled legislation carrying the force of law nor (b) an imminent constitutional crisis which threatens governmental operation. When in *Ethics Com'n v. Cullison*, 1993 OK 37, 850 P.2d 1069, the Court assumed original jurisdiction, the case clearly satisfied the justiciability criterium of "immediacy and reality" since it raised the specter of an "intolerable conflict" between co-ordinate branches of government which possessed the potential

all Agencies, Commissions and Boards created by law."

11. For examples of circumstances presenting crises of a constitutional dimension warranting the assumption of original jurisdiction, see *Bellmon v. Barker*, 1988 OK 79, 760 P.2d 813, and *Ethics Com'n v. Cullison*, 1993 OK 37, 850 P.2d 1069. Both cases involved "intolerable conflict" *between co-ordinate branches of government* which possessed the potential for gridlock. *Id.* at 1073.

12. The separation-of-powers doctrine is most appreciated when viewed in the context of governmental checks and balances. Mr. Justice Brandeis assessed the value of the separation-of-powers doctrine (as it relates to the federal government) when he observed:

"The doctrine of the separation of powers was adopted by the convention of 1787 not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was not to avoid friction, but, by means of the inevitable friction incident to the distribution of the gov-

ernmental powers among the three departments, to save the people from autocracy." *Myers v. U.S.*, 272 U.S. 52, 47 S.Ct. 21, 85, 71 L.Ed. 160.

13. The terms of Okla. Const. art 4, § 1 provide:

"The powers of the government of the State of Oklahoma shall be divided into three separate departments: The Legislative, Executive, and Judicial; and except as provided in this Constitution, *the Legislative, Executive, and Judicial departments of government shall be separate and distinct*, and *neither shall exercise the powers properly belonging to either of the others.*" [Emphasis added.]

14. *Tweedy v. Oklahoma Bar Ass'n*, 1981 OK 12, 624 P.2d 1049, 1054.

15. *Application of Fun Country Development Authority*, 1977 OK 138, 566 P.2d 1167.

16. *State of Okla. ex rel. Dept. of Transp.*, 1982 OK 36, 646 P.2d 605, 608–609.

for governmental gridlock.[17] Because no such immediacy or reality exists in the present cause,[18] the test for justiciability remains unmet and original jurisdiction cannot be assumed.[19]

 ¶ 10 Secondly, because Dank's claim comes solely in the guise of an *intra-House* dispute, its justiciability must also be assessed in conjunction with the separation-of-powers doctrine. Dank's "application to assume original jurisdiction" asks the Court to issue mandamus to force the Legislature's compliance with the "read at length" provision. This the Court cannot do. Oklahoma's extant jurisprudence clearly delimits the Court's power over the Legislature. In *Jones v. Freeman*, 193 Okla. 554, 146 P.2d 564 (1944), it was held:

> "The Legislature, being a co-ordinate branch of the government, may not be compelled by the courts to perform a legislative duty, even though the performance of that duty be required by the Constitution."

Generally speaking, the separation-of-powers doctrine prevents the Court's intrusion by writ of mandamus into the House's exercise of its constitutionally-assigned legislative function.[20] Because of the context in which the petitioner brings her application—an *intra-House* dispute—her cause is not susceptible of resolution through specific relief of a conclusive nature. Because there is no adequate relief which can be crafted to resolve Dank's claim [at least in the context in which it comes to the Court], petitioner's claim is not justiciable, i.e., suitable for judicial inquiry. It fails to satisfy the third element of the enunciated test for justiciability.

### III

### CONCLUSION

¶ 11 By her application petitioner would have the Court assume original jurisdiction over an *intra-House dispute*, construe the "read at length" provision of Okla. Const. art. 5, § 34, and mandate rules of procedure to be used in the House to implement the Court's construction of the constitutional provision.

¶ 12 The declaratory relief which Dank seeks is not available under the facts of her application because it does not present circumstances imbued with the immediacy and reality required under Oklahoma's extant jurisprudence to grant a declaratory judgment. Further, the Court is without authority to interject itself into the legislative process [assigned by the constitution to the House] by directing how that body shall conduct its business. While not giving the petitioner the judicial solution she seeks, the Court's pronouncement does give efficacy to the limitations on governmental function posited with each governmental branch by the people of Oklahoma under the separation-of-powers doctrine. [21]

---

**17.** *Cullison, supra* note 11 at 1703.

**18.** Petitioner asks that the sought declaratory relief be given *"prospective"* application. *See* Dank's Brief in Support of Application to Assume Original Jurisdiction, p. 14. Her request necessarily implicates the immediacy criterium enunciated in *Keating v. Johnson*, 1996 OK 61, 918 P.2d 51, 55. There the Court held:

> "[T]he present posture of the case as delivered to us by petitioners, *particularly in light of their own request that we make any decision prospective to a future date* to afford the Governor and Legislature time to enact curative legislation should we decide one or more of the challenged provisions are unconstitutional ... appears to counsel against a determination there

is any need for our *immediate* attention. In our view, although the question(s) presented are important, *petitioners have failed to show there is some immediacy* involved in this controversy that would call for this Court to exercise its discretion to hear the matter at the present time." [Emphasis added.]

**19.** *Puckett v. Cook*, 1978 OK 108, 586 P.2d 721, 723.

**20.** *Romang v. Cordell*, 1952 OK 139, 206 Okla. 369, 243 P.2d 677, 680; *City of Bethany v. District Court of Oklahoma County*, 200 Okla. 49, 191 P.2d 187, 189.

**21.** *See* Okla. Const. art. 4, § 1 *supra* note 13.

¶ 13 Petitioner's application presents a nonjusticiable controversy. Hence, her "application to assume original jurisdiction" is denied.

¶ 14 SUMMERS, C.J., HARGRAVE, V.C.J., OPALA, KAUGER, WATT, BOUDREAU, and WINCHESTER, JJ., concur.

¶ 15 HODGES, J., dissents.

SUMMERS, C.J., Concurring, and joined by KAUGER and WATT, JJ.

¶ 1 Although I agree with the opinion, it is my additional observation that the Speech or Debate Clause of the Oklahoma Constitution[1] insulates Speaker Benson from suit in this case. *Ethics Commission v. Cullison,* 1993 OK 37, 850 P.2d 1069 is clearly distinguishable. See separate opinion of Opala, J., concurring in result therein, 850 P.2d at 1083–1085. There the Speaker and President Pro Tem were but nominal defendants; the suit was against the state itself to invalidate specific legislation. Here the acts of the Speaker in conducting business within the chamber of the House of Representatives are called into question; no attack is made against the validity of any particular legislation. The clause has been applied to acts of a legislative nature as well as to speech narrowly defined. *Powell v. McCormack,*

395 U.S. 486, 502, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). The Speaker is immune from suits of this sort.

OPALA, J., concurring.

¶ 1 The court *declines* today to take original cognizance of this cause which tenders a claim against the Speaker of the House of Representatives by a member-legislator who seeks judicial declaration that certain internal procedures for processing bills to final passage contravene the provisions of Art. 5, § 34, Okl. Const.[1] The petitioner urges that the offending procedures be declared infirm and be replaced by those—to be crafted by this court[2]—which would be made conformable to the mandates of that section. I write separately *in concurrence* to add *my own analysis* of some points in contest.

I

THE PROCESS APPLIED IN THIS CAUSE DID NOT ABRIDGE THE SPEAKER'S CLAIMED IMMUNITY

¶ 2 The Speaker moved that he be dismissed from the cause because he "cannot be haled before the Supreme Court to answer for his legislative activities...." His motion unmistakably invokes the "absolute immunity" claimed to be conferred by the so-called Speech or Debate Clause in Art. 5, § 22, Okl.

---

1. Oklahoma Constitution, Art. V § 22 provides:
 Senators and Representatives shall, except for treason, felony, or breach of the peace, be privileged from arrest during the session of the Legislature, and in going to and returning from the same, *and, for any speech or debate in either House, shall not be questioned in any other place.* (emphasis added)

1. The terms of Art. 5, § 34, Okl. Const., are:
 Every bill shall be read on three different days in each House, and *no bill shall become a law unless, on its final passage, it be read at length,* and no law shall be passed unless upon a vote of a majority of all the members elected to each House in favor of such law; and the question, upon final passage, shall be taken upon its last reading, and the yeas and nays shall be entered upon the journal.
 (emphasis supplied).

2. *Constitutional jurisprudence of long vintage and unimpeachable authority teaches with unmistakable clarity* that under the separation of powers commanded by Art. 4, § 1, Okl. Const., the Supreme Court may neither claim for itself—nor exercise legislatively conferred—power to promulgate rules that would regulate the conduct of any organ of state government other than of judicial institutions inferior in rank. *Sterling Refining Co. v. Walker,* 1933 OK 446, 25 P.2d 312, 320. For my earlier description of the *Sterling* holding, see *Nelson v. Nelson,* 1998 OK 10, 954 P.2d 1219, 1233, n. 30 (Opala, J., dissenting in part); *Petuskey v. Cannon,* 1987 OK 74, 742 P.2d 1117, 1125 n. 4 (Opala, J., concurring); *State ex rel. York v. Turpen,* 1984 OK 26, 681 P.2d 763, 767 (Opala, J., concurring).

Const.[3] The Speaker's motion has not been reached for disposition. It remains pending. The court's opinion explains that "it is not necessary to reach ... the respondent's claim of immunity" because we "decline to assume original jurisdiction" over this cause and grant no relief against the claimed-to-be-immunized Speaker.

¶ 3 The immunity interposed by the Speaker, if indeed his due in this cause, *does not free him of the law-imposed responsibility to move this court for his dismissal from the suit.*[4] The duty to determine whether a movant's invoked legislative immunity applies to the action is cast on the court entertaining the case. Even if the Speaker's fundamental-law exemption were deemed to be *immunity from suit as well as from liability,*[5] he is immune neither from the court's process nor from its service.[6] The court's refusal to reach the motion to dismiss is hence free from constitutional flaws.[7]

3. The text of Art. 5, § 22, Okl. Const., is:

 Senators and Representatives shall, except for treason, felony, or breach of the peace, be privileged from arrest during the session of the Legislature, and in going to and returning from the same, and, for any speech or debate in either House, shall not be questioned in any other place.

4. When immunity is granted but the controversy is deemed justiciable the case need not be over. *See, e.g., Powell v. McCormack,* 395 U.S. 486, 504–05, 89 S.Ct. 1944, 1955–56, 23 L.Ed.2d 491 (1969); *Dombrowski v. Eastland,* 387 U.S. 82, 85, 87 S.Ct. 1425, 1427–28, 18 L.Ed.2d 577 (1967); *Kilbourn v. Thompson,* 103 U.S. (13 Otto.) 168, 202, 26 L.Ed. 377 (1880), where the Court dismissed the actions against the congressmen but allowed them to proceed against substituted parties—legislative employees who implemented the legislators' unconstitutional orders and resolutions.

5. It is unnecessary to pass here on the distinction between an immunity from suit and one from liability. For cases that recognize that distinction, see *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 166, 113 S.Ct. 1160, 1162, 122 L.Ed.2d 517 (1993); *Bergner v. State,* 144 Conn. 282, 130 A.2d 293 (Conn.1957); *Handmaker v. Henney,* 128 N.M. 328, 992 P.2d 879, 883–84 (1999); *Scott v. Prairie View A & M Univ.,* 7 S.W.3d 717, 719 (Tex.App.1999); *Descant v. Administrators of the Tulane Educational Fund,* 639 So.2d 246, 249

**II**

**TODAY'S PRONOUNCEMENT DOES NOT SIGNAL A RETREAT FROM THE COURT'S FUNDAMENTAL–LAW RESPONSIBILITY TO REVIEW GOVERNMENT ACTIONS THAT ARE CHALLENGED IN THE FRAMEWORK OF A JUSTICIABLE CONTROVERSY FOR LACK OF CONFORMITY TO THE COMMANDS OF THE CONSTITUTION**

¶ 4 No one need be alarmed by today's refusal to accept a nonjusticiable claim. The public must be protected against the judiciary's excessive intrusion into day-to-day conduct of government by operating an on-demand answering service for questions about constitutional orthodoxy.

¶ 5 Today's pronouncement does not decide that *all intracameral*[8] *controversies* over internal procedures[9] are unsuitable for judicial testing. Neither does it settle the notion

(La.1994); *Cundiff v. Crider,* 303 Ark. 120, 792 S.W.2d 604, 606 (1990); *Ross v. Consumers Power Co.,* 420 Mich. 567, 363 N.W.2d 641, 651–52 (1984); *Guillaume v. Staum,* 328 N.W.2d 259, 261 (S.D.1982); *Miller v. Chou,* 257 N.W.2d 277, 280 (Minn.1977); *State v. F.W. Fitch Co.,* 236 Iowa 208, 17 N.W.2d 380, 384 (1945).

6. *Powell, supra* note 4, 395 U.S. at 505, n. 25, 89 S.Ct. at 1956; *Tenney v. Brandhove,* 341 U.S. 367, 377, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951); *Gravel v. U.S.,* 408 U.S. 606, 618–21, 92 S.Ct. 2614, 2624–25, 33 L.Ed.2d 583 (1972).

7. Immunity from suit or liability presents for analysis a concept different from that of immunity from service of process. *Bingham v. Bingham,* 1961 OK 263, 366 P.2d 396, 398.

8. *"Intracameral"*, as used in the text, means occurring in and applicable to the internal operations of a legislative chamber. "Cameral" is defined as "of or relating to a legislative or judicial chamber." Webster's Third New International Dictionary at 322 (1961). The term "intra" means "within", "during" or "internal." *Id.* at 1185.

9. Judicial intrusion upon internal procedures of a legislative assembly must be consistent with the autonomy of each chamber, which is commanded by Art. 5, § 30, Okl. Const. The pertinent terms of § 30 are:

 Each House may determine the rules of its proceedings. . . .

that a legislator's claim—based on his/her *severely impaired capacity to participate in an informed deliberation* before final passage of a bill—may not be fit for judicial relief. The court's rejection of petitioner's challenge rests solely on its conclusion, in which I concur, that nonjusticiability makes this controversy unsuitable for judicial cognizance.

¶ 6 Judicial cognizance cannot be invoked by pressing a nonjusticiable controversy—one that presents nothing more than an academic or abstract issue.[10] Unlike the State's Attorney General, this court cannot serve government officials by routinely answering their requests for guidance on the conformity of contemplated or taken actions to the Constitution's mandate.[11] The barriers of justiciability [12] prevent judges from roving outside the judicial role and giving voice to abstract grievances.[13] Courts are not *roving commissions* assigned to pass judgment on the validity of internal legislative procedures. Consti-

tutional judgments are justified only out of the *strict necessity* generated in particular cases in which rights between the litigants brought before the court *must be* adjudicated.[14] Mere intracameral *disagreement* over the constitutional norms that chart the boundaries of internal procedures is not enough to supply the critical element of justiciability.[15] Much more is required of this claim by a legislator who seeks judicial declaration that certain internal procedures for processing bills to final passage contravene the provisions of Art. 5, § 34, Okl. Const.[16]

¶ 7 No one should assume from today's pronouncement *that under no circumstances* can a legislator's claim be remediable when it is rested on a deprived or impaired opportunity to *participate in the "informed deliberative process."* Extant federal jurisprudence persuasively demonstrates that *relief must be crafted* to vindicate the claim of an individual legislator who also tenders a public right. In at least two cases [17] found justiciable, a *wrongly expelled* lawmaker was reinstated to

10. *Hughey v. Grand River Dam Authority*, 1995 OK 56, 897 P.2d 1138, 1143; *Northeast Okl. Elec. v. Corporation Com'n*, 1991 OK 28, 808 P.2d 680, 683; *Westinghouse Elec. v. Grand River Dam Auth.*, 1986 OK 20, 720 P.2d 713, 718; *Traders Compress Co. v. Board of Review, Okl. Employment Security Commission*, 1950 OK 274, 224 P.2d 268. *See also Application of Goodwin*, 1979 OK 106, 597 P.2d 762, 765 n. 8.

11. *York, supra* note 2 at 766–67.

12. To be appropriate for judicial inquiry, a controversy must be justiciable. Included within the rubric of justiciability is a controversy which (a) is definite and concrete, (b) concerns legal relations among parties with adverse interests, and (c) is real and substantial so as to be capable of a decision granting or denying specific relief. *Keating v. Johnson*, 1996 OK 61, 918 P.2d 51, 60 (Opala, J., concurring); *Hendrick v. Walters*, 1993 OK 162, 865 P.2d 1232, 1238; *Application of State ex rel. Dept. of Transp.*, 1982 OK 36, 646 P.2d 605, 609; *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240–242, 57 S.Ct. 461, 464–465, 81 L.Ed. 617 (1937); *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 324–325, 56 S.Ct. 466, 472–473, 80 L.Ed. 688 (1936); *Hatfield v. King*, 184 U.S. 162, 165–166, 22 S.Ct. 477, 478, 46 L.Ed. 481 (1902). For a discussion of the justiciability doctrine in the federal judicial system, see Wright, Miller & Cooper, 13 Fed. Prac. & Proc. Juris.2d § 3529 (1984).

13. *Keating, supra* note 12 at 60 (Opala, J., concurring).

14. *See Broadrick v. Oklahoma*, 413 U.S. 601, 610–611, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973); *In re Snyder*, 472 U.S. 634, 642–643, 105 S.Ct. 2874, 2880, 86 L.Ed.2d 504 (1985); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501–502, 105 S.Ct. 2794, 2801, 86 L.Ed.2d 394 (1985); *I.N.S. v. Chadha*, 462 U.S. 919, 937, 103 S.Ct. 2764, 2777, 77 L.Ed.2d 317 (1983); *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

15. *Keating, supra* note 12 at 61 (Opala, J., concurring), which states:
 "Justiciability" is defined in *Ethics Commission v. Cullison*, [1993 OK 37] 850 P.2d 1069, 1083 n. 19 (Opala, J., concurring in result) as follows: A *justiciable* controversy is a *real and substantial cause which is appropriate for judicial determination*, rather than a dispute or difference of hypothetical, abstract or academic nature.
 (emphasis in original).
 *See also Aetna, supra* note 12, 300 U.S. at 239–241, 57 S.Ct. at 463–464; WRIGHT, MILLER & COOPER, 13 Fed.Prac. & Proc. Juris 2d § 3529 at 282–283 n.14 (1984).

16. *Cullison, supra* note 15 at 1080 n. 2 (Opala, J., concurring in result)(declaratory relief is available under the rubric of original jurisdiction).

17. *Powell, supra* note 4, 395 U.S. at 550, 89 S.Ct. at 1979; *Bond v. Floyd*, 385 U.S. 116, 135–37, 87 S.Ct. 339, 349–50, 17 L.Ed.2d 235 (1966); *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

his legitimate office-holder status.[18] If presented in a justiciable posture, a significant impairment of a lawmaker's access, in a legislative assembly, to informed deliberation could be argued as akin to *pro tanto* expulsion from office.[19] *In short, judicial self-restraint is not without limit.*

¶8 At the core of petitioner's complaint are certain internal procedures alleged to give her *too little time for informed deliberation* before complex bills are processed to final passage. If the handicap dealt her by these procedures could be said to *diminish* her effect on the bill's progress *in a manner akin* to a legislator's *pro tanto* [20] *exclusion* [21] from participating in the work of the assembly *or be found similar in result to reduction of her vote's weight* in an assembly tainted by geographic maldistribution of representatives,[22] the negative impact on her effectiveness and the ensuing harm to the constituency would be apparent. In short, internal procedures may produce adverse *extracameral* [23] *consequences* not only upon passage of bills to final adoption but also upon full-breadth participation of a chamber's membership.

## SUMMARY

¶9 The court did not abridge the Speaker's claimed immunity nor did it abdicate its duty to test the legality of those government

actions that stand presented in a posture suitable for judicial relief.

HODGES, J., dissenting:

¶1 I dissent to this Court's pronouncement in this matter. Because this dispute is based on a constitutional mandate, *see* Okla. Const. art. V, § 34, rather than the internal operating procedures of the Oklahoma House of Representative, this Court is presented with a justiciable controversy.

---

18. *Powell, supra* note 4, 395 U.S. at 550, 89 S.Ct. at 1979 (the U.S. House of Representatives acted unconstitutionally when it effectively expelled Adam Clayton Powell by a majority vote because of charges that he had misappropriated public funds and abused the process of the New York courts); *Bond, supra* note 17, 385 U.S. at 135–37, 87 S.Ct. at 349–50 (the Georgia House of Representatives acted unconstitutionally when it excluded Julian Bond for making statements criticizing the federal government's policy in Vietnam).

19. *Powell, supra* note 4, 395 U.S. at 507–12, 89 S.Ct. at 1956–59; *Bond, supra* note 17, 385 U.S. at 135–37, 87 S.Ct. at 349–50.

20. As I use it here, the phrase *"pro tanto* exclusion" means exclusion to the extent that a legislator is deprived of full-breadth participation by the absence of an informed deliberative process. The term *"pro tanto"* means "for so much; to a certain extent." *Webster's, supra* note 8 at 1822.

Black's Law Dictionary defines *"pro tanto"* as "[f]or so much", "for as much as may be," or "as far as it goes." *Id.* at 1222 (6th Ed.1990). *See* First Bank of Turley v. Fidelity and Deposit Ins. Co. of Maryland, 1996 OK 105, 928 P.2d 298, 308 n. 40, citing *Hart Industrial Supply Co. v. Craig,* 1965 OK 108, 405 P.2d 93, 97 (Jackson, V.C.J., concurring specially).

21. *Powell, supra* note 4, 395 U.S. at 507–12, 89 S.Ct. at 1956–59; *Bond, supra* note 17, 385 U.S. at 135–37, 87 S.Ct. at 349–50.

22. *Baker, supra* note 17, 369 U.S. at 204, 82 S.Ct. at 703.

23. By *"extracameral* consequences" I mean that effect of an assembly's work which reaches beyond the four walls of a legislative chamber. For the definition of "cameral" see *Webster's, supra* note 8. The term "extra" means "outside" or "beyond." *Id.* at 806.